Good morning, your honors. May it please the court. My name is Samuel Weiss. I represent the appellant, Mr. Bilal Adom. I'll try to reserve three or four minutes for rebuttal. I'll keep an eye on it. On August 16, 2021, Mr. Adom was transferred housing units within his prison. For the previous year, he had suffered from incontinence and he had, in his record, a permanent disability accommodation of diapers, where he was given 14 diapers a week. In defendant's own records, you can look at the Reasonable Accommodation Panel publication. They say that this transfer from one housing unit to another triggered the removal of this permanent disability accommodation. Defendants in their brief on pages 9 and 29, they say at around the time of the transfer, there was a medical examination that determined it wasn't treated. There's no evidence of that in the record whatsoever. Their own citations demonstrate that the prison said it was the transfer that led to the removal of the disability accommodations. Why would a transfer from one housing unit to another, to somebody in a wheelchair suffering from incontinence, result in them getting their diapers taken away? I don't know. Can I jump in, because this is going to help me in terms of thinking about the comments that you're going to make. I want to be very clear about the relief that you're seeking here. So I understand you're seeking damages. That's fine. On the injunctive side, what is it that you want us to order, if you were to, not us, but a court to order, if you were to prevail in this case? Are you wanting the court to order that a permanent accommodation order be put in place like he had before, or are you wanting the court to order just directly always give him his accommodation that he's requesting, aside from California's regulatory structure? That's a great question, and I have two answers. The first is, just a permanent accommodation would be an acceptable order. Within the prison scheme? Yes.  Regardless of any further medical examination, a permanent accommodation? Not regardless of any further examination. But the regulation provides that when it's a permanent provision, an accommodation, it can be changed subject to a medical exam. Is that correct? That's exactly right. And defendants make that point to discuss the fact that he has a temporary accommodation. Now, and they make that point to say, well, there's really not that much of a difference between a temporary accommodation and a permanent accommodation. And that may be true, but to have a live claim, you just need to be able to obtain some relief, and that's why we think the injunctive claim is still live. And just the second point to your question, you caught yourself, right? Defendants cite these cases about the limits of injunctive relief, where, and those are all appeals coming up from issued injunctions, normally preliminary injunctions. That's not the case here. So it's, we have a live damages claim. It's going to go back down on the ADA anyway. And so this isn't a circumstance where we have to grapple with, does this court have appellate subject matter jurisdiction? Would the district court have appellate subject matter jurisdiction? Because we know they do for the ADA claim over the damages. The only question would be when it comes time for trial, what are the remedies? I have a follow-up question on the injunctive side, but before I get there, before I forget, are you seeking declaratory relief? Yes. And that's still live in the case? There's like very little reference to that. I think it's in the complaint perhaps, but I don't see a whole lot of discussion about it. So I'm not sure if it's still live, but you think that there's still a declaratory relief claim here? Yes, we still do. And I think that goes to Thomas v. Ponder and this court and the Supreme Courts. What is the declaration you're seeking? That as long as he is suffering from incontinence, it violates the ADA to not provide him diapers. So just to quickly finish the thought, Thomas v. Ponder and this court and the Supreme Courts and other cases about the liberal reading of complaints and pleadings from incarcerated and pro se plaintiffs, we think even if he didn't do it perfectly, we think the issue is still live. All right, so set that aside for a second. Let's come back to the injunction point. We have case law and I think the Supreme Court has been clear that if you get what you want before you file suit, as opposed to like you file suit and then there's a change of course in terms of the defendant's actions, if it happens before you file suit, you don't have standing basically for injunctive relief in particular. I'm not sure that that works. If it's true that declaratory relief is still on the table, so we'll just set that aside for a second and say if we only are dealing with injunctive relief, how do you get around that problem where he got the order from the prison that he won? I mean, I know it says temporary instead of permanent. Maybe that's the nature of your wants before this lawsuit was filed. That's correct. Subject to the limitation that you said and I think it's a great question and that the district court and the defendants both briefed the issue as a mootness issue and so that's how we responded to the district court. I think if it's a mootness issue, it's pretty clear we win because the burden is on the defendants to show that no relief is possible. I'm thinking it's a standing problem. Well, I think that that's an astute observation. I think we do make an argument that it should be better thought of as mootness because he began exhausting his administrative remedies, which the Prison Litigation Reform Act requires to bring a suit. So we think that we couldn't find cases on this either way but that it could be thought of as a voluntary secession. But even if that's not compelling, we think if this court views it as a standing issue that they should just say and defendants, I think on page 8 of their brief, to say this is a temporary accommodation, this is a permanent accommodation. Temporary accommodations, they think that's a difference. And that's in the regulations, right? That the temporary accommodation has an expiration and a permanent one is subject to medical evaluation. Exactly right, Judge Piazza. And I think to maybe explain why this isn't pedantic or overly lawyerly, I think to somebody who went five months without diapers when he was constantly urinating on himself, he's in a wheelchair, he's mobility impaired, he's injured, he's humiliated, we have this pile of contemporaneous documentation about the pain and humiliation he's gone through. The difference between being told that actually he will get the diapers for as long as he has this incontinence issue versus this is temporary and it's subject to expiration. I understand that argument. I think that's a real difference. It's a little bit hard to square that there's much of a difference between temporary and permanent given what happened to him, right? That he moves from one unit to the next. As you've indicated, the record doesn't indicate that there was a medical evaluation and his permanent thing was retracted summarily. That's exactly right. I do think, I take that point and I also think it would be rewarding defendants for violating their own regulations. Just because the regulation was violated in this particular case doesn't mean that there's no benefit to getting a permanent accommodation. Also, I'd be happy to move on to the merits of the ADA claim. We think it has to go back on damages regardless. Why is that? Why are you so certain with that? Well, I'd be happy to run through the elements. So, he has a disability, which is a substantial impairment on a major life activity. It's a very liberal definition of the term. Toileting is a service under the program, is a program service or activity under the ADA. He lacked meaningful access to hygiene and toileting when he was regularly urinating on himself and in terrible pain. He sought a reasonable accommodation. That accommodation was denied. This whole thing was kicked off, of course, by a form of anti-accommodation. This is directly analogous to this court's opinion in Munoz v. California Department of Corrections and Rehabilitation, which was a man with a knee injury had a lower bunk pass. It was removed. He didn't know why. He was given no reason. And he tried to get the knee pass, the upper bunk pass, again. And the prison said, no, you don't deserve it, even though medical evidence suggested otherwise and his testimony suggested otherwise. And this court reversed. And for deliberate indifference in the context of the ADA, that's just that the defendants were on notice, that they were aware, and then disregarded a potential risk of a violation of the ADA. Again, we have piles of grievances. He told medical officials. He went through the process he was supposed to go through. He filled out his disability accommodation forms. First, I mean, this case is a little bit more complicated in the sense that some of these cases are, there's just no response whatsoever, or just like, we don't believe you, or just blowing off, right? And that's not here. He was given things like close access, or I think he had a cell with a toilet in the cell, and then additional linens. Anyways, he was given some other things, including things that he had requested in the alternative to his primary request, which was the incontinent supplies. So in that context, why is deliberate indifference shown, or at least a question of fact on that for the jury? Right. So how that would slot in, so he requested diapers, or in the alternative, some linens to wrap around himself so he could do makeshift diapers. For about a month and a half, he didn't even get that. And then we have some evidence that in the morning, he was allowed to take showers. So the way that would map onto the doctrine of the ADA is that would be a reasonable accommodation, right? So he asked for an accommodation. They didn't give him the accommodation he sought, but they did give him another accommodation. So the question, so that would be the potential defense. When we talk about a knowing disregard of a potential risk of violating the ADA, that would be the potential defense. Defendants actually didn't make any defense that that was a reasonable accommodation. They didn't brief that. I know deliberate indifference is a separate issue, but it incorporates the substantive standards through the risk of a violation. And the reasonableness of accommodation, like most reasonableness inquiries, is very context and fact specific. It's normally a question for a fact finder. We could have elucidated that more if it had been raised as a defense. But we think it's, a fact finder could certainly find that that was inadequate given the pain and suffering that he was going through and given the trivial amount of effort it would have taken to just give him the diapers. The fact that they accommodated the disability at all suggested that they thought he had an incontinence problem. That's one of the sort of mysteries in this record is that there's nothing in the record where defendants say, you know, we talked to people on your unit and you're lying or we know you've abused this in the past. There's none of that at all. So a jury could certainly make a finding that that was not a reasonable accommodation and they could make a finding that defendants were on notice that that was not a reasonable accommodation and disregarded that risk. I'll reserve my time unless there are other questions. Thank you. Thank you. Your Honors, may it please the Court, Adam Stoddard on behalf of Dr. Ladd. Counsel's entire argument so far, I did not hear him once mention Dr. Ladd, whether it was deliberate indifference to any condition that Mr. Adam had. It was telling that he kept saying that he was in severe physical pain. I took Dr. or Mr. Adam's deposition and I asked him, did you sustain any physical injuries as a direct result related to the urine itself? And he testified unequivocally, no. So I understood his complaint to be that at night he had this problem quite frequently at night. And as a result, he had to get up and move around and, you know, do things. And given his condition, that that caught, that was painful. He did testify to that. But for Dr. Ladd specifically, when he saw him, he had already been seen by two prior providers, a nurse on October 1st, 2021, and then Dr. Ladd on December 7th, 2021, and then Dr. Lordestain on December 29th, 2021. And at no time when he was seen by these providers was there the permanent accommodation. It was up to the medical providers to determine whether or not he needed that accommodation. And for Dr. Ladd, this isn't really about, it's not an ADA claim. It's a deliberate indifference claim. Did he need medically to be treated and seen for an alleged incontinence? Dr. Ladd did a very thorough investigation. He asked him, he evaluated him, he questioned him regarding his past medical history, confirmed that Mr. Adam did not have a history of prostate surgery or radiation and no history of spinal stenosis. Dr. Ladd then, after taking that information into account, believed that if he was truly having incontinence, the proper course was to prescribe a medication to treat the underlying incontinence, not to give him an accommodation such as adult diapers to clean up the mess after. Arguably, it would be a deliberately indifferent to not treat the medical underlying condition if there was one. So by Dr. Ladd giving him a trial of... Did Dr. Ladd, I don't think, consider whether or not he had an enlarged prostate? I think, I don't know if, I think based on the question, he had no history of prostate surgery. I don't think that was in the records whether he considered it was an enlarged prostate. So I can't answer that question. I'm no doctor or anything, but enlarged prostate does cause problems. And I think the issue was, okay, well if you are having an overactive bladder or whatnot, if there is a medically underlying condition like an enlarged prostate, the oxybutynin was a trial to see if it would treat the condition. So Dr. Ladd tried to treat the condition as opposed to say, here's adult diapers, I don't know what's causing this incontinence, but this will help clean up the mess. I thought that the, at least part of the argument against Dr. Ladd was he did the prescription, it doesn't work out because there are side effects for Mr. Adam, and then there's nothing else done. Well, Dr. Ladd specifically has in his note, he says that I'm going to give you a trial of oxybutynin, and if that doesn't work, I would consider adult diapers at that point. Right, so isn't that the window of deliberate indifference perhaps as to Dr. Ladd in terms of like once it's known that the prescription doesn't work out, and then there are no steps, like he doesn't do anything else, he doesn't try something else. Well, he was never seen by Dr. Ladd again. He was seen by Dr. Lordestan. So how does that work in the prison in terms of like who learns that the prescription isn't working out, and then like who's going to pick up the ball there? Well, as far as Dr., I don't know how the prison system works. I don't know who sees the provider next, and which, I think it's probably just a who's on call on that day, and for Dr. Ladd on this day, he was on call, he saw him. He didn't believe medically it was necessary that he had a serious medical need that required adult diapers. So he has no continuing obligation to the patient that he saw? Well, I don't, I mean from a medical standpoint, I think it would be who's next in line, and they obviously have access to the records. They can see what the prior provider prescribed, and if he says it's not working out, then whatever the next provider is going to do is going to be their medical decision making. But Dr. Ladd, it's not like the inmate says, well, I saw Dr. Ladd last time. I only want to see him next time. He's now my primary treating provider. It's really just who's on call, and on that given day, Dr. Ladd examined him medically, determined there was not a serious medical need, believed that, okay, maybe you do have incontinence. Let's prescribe a medication to see if that is going to treat the underlying condition. And then the next provider, if he says, hey, look, I'm having other symptoms related to this medication. I don't want to do it anymore. Then it would be up to their medical decision making to determine what to do. But that would just go to, well, was it medical malpractice, you know, not to treat this or to treat it? And I have an expert declaration that confirms that he complied with the standard of care. He appropriately treated it, and had he not tried to prescribe some medication to treat the underlying condition, that would be below the standard of care. So I just don't see a deliberate indifference cause of action against Dr. Ladd specifically, because he did not ignore the symptoms. He, and I see him going over, but he actually tried to treat the symptoms. I was just going to, well, never mind. Your time is, you're over your time. Okay. Thank you, Your Honors. Thank you, counsel. All right. Ms. Gansen. We can't hear you. You're going to have to unmute or turn up or something. Can you hear me now, Your Honor? Yes. Thank you. My name is Jamie Gansen. I'm a Deputy Attorney General for the state, and I represent CDCR, Dr. Maldegran, Ashley, Loderzain, Mojica, and Sawyer. The court correctly granted summary judgment on the Eighth Amendment claims and the ADA claims because Adam did not demonstrate a trial full dispute with respect to each required element of the claims that he chose to bring. So turning first to Dr. Maldegran, and I would like to correct an error in the reply brief. Dr. Maldegran did not waive qualified immunity. She did raise it below in the summary judgment briefing at approximately page 21. So Mr. Adam was part of the prison's chronic care program, and we know that from ER 143 and 144, which discusses the appointments by Dr. Ladd and Dr. Sun, who's not part of this action, who saw him in October. And this chronic care program means that inmates are seen regularly by different Dr. Maldegran in September for the first time he had seen her. He was there for an ophthalmology follow-up appointment, and he asked the nurse at the beginning of the appointment for diapers so he could apply them quickly. She redirected him to the assigned nurse who was in charge of the durable medical equipment program. So she's responsible for consistent and correct release of such accommodations. So Mr. Adam goes into the room, and he says, at that point, Dr. Maldegran told him he was being seen for ophthalmology follow-up. She did see him. Now, she's a prescribing doctor. So when inmates go out to medical and come in, it's the CDCR doctor, Dr. Maldegran in this case, who was responsible for his prescriptions, for assessing whether the recommendations of the outside ophthalmologist were correct and what to prescribe. So she conducts a strength and reflex examination. It is a standard examination. I know Mr. Adam contends it was conducted too roughly, but this is a standard exam used to detect neurological defects, and it's very typical for patients who have a history of stroke or other neurological conditions, something very appropriate for someone who's going to be prescribing medicine to be conducting. Although Mr. Adam said it was conducted too roughly, he did not claim that more than de minimis force was used or more than de minimis injury was sustained. In fact, he didn't require any treatment, and he didn't point to anything in the course of that exam that rises to the level of an Eighth Amendment violation. Key here, there's no evidence that Dr. Maldegran knew at the time that Mr. Adam was unable to obtain diapers through appropriate channels, that his back pain and changing his dressings at night was part of the equation, or that any serious medical risk existed. As the court previously discussed, Mr. Adam admitted he didn't have any injury from the urine itself. And so on these facts, it's simply not enough in the record to show deliberate indifference by Dr. Maldegran. We also know that she scheduled a follow-up ophthalmology appointment. She resolved an issue with a refill that Mr. Adam thought had been discontinued, and she arranged for same-day provision of the medication, and she approved other medications for him. So her care just didn't rise to the level of an Eighth Amendment violation. Moving to CDCR, and there's a point on the ADA claim. Although plaintiffs are now claiming they're looking for declarative relief, I did not see anything about declaratory relief in the arguments on appeal. As for the injunctive relief, there is a standing. I mean, did that come up in the district court, the declaratory relief aspect? I'm not sure if it's in the district court order. I'm not sure what to do with a waiver or a forfeiture argument if the defendants never raise the issue, because it is in the pleading. Yes, Your Honor. And there's also a standing problem, as the court noticed. To the extent that Mr. Adam is seeking relief into the future, he has not made the requisite element. And a key issue here is that his accommodation for diapers was restored nine months before he brought suit. It's been approximately three and a half years since then, and he hasn't alleged any ongoing issue. Why wasn't he given a permanent order like he had before? That is not in the record, Your Honor. But the only difference is how often the accommodation is reviewed. And here, even with the temporary order, over three and a half years, he's had no issue with it. He hasn't raised any issue with it being revoked or having any problem getting the diapers. And because of that, and we're in a prison case, so we have the PLRA's needs, narrowness, intrusiveness elements to meet here as well. And I think he simply cannot meet those elements in this case, given that he hasn't had an issue for three and a half years. Now, as far as the ADA claim, the backward-looking claim for damages, I think it fails for three reasons. The first being that he had no showing that he was denied an accommodation because of his disability. Quite to the contrary, the record does show that prison officials looked at his medical records, made assessments, and that the reason the reasonable accommodation panel did not give diapers was because medical professionals determined he didn't have a medical need from them. So that's not because of his disability. After his transfer or before his transfer? That was after his transfer. What appears to have happened... Can you explain to me what happened when he was transferred? There's not much in the record. However, ER pages 245 and 234 show that upon Mr. Adams' housing change, there was a review with his file. There was no corroborating data or diagnosis showing that diapers were medically necessary. And so it looks like they were discontinued on that ground. There are also a few places in the file where it shows that the accommodation expired. Did anybody check to find out why he was getting diapers? I don't know. There's just not in the record for the extent of it. What we do know, though, is that... Does the record show how long he had been receiving diapers at the ER before he was transferred? I don't believe so, Your Honor. What my understanding of it is that he was receiving diapers as an accommodation while they tried to figure out whether there was medical need, and there wasn't. But the other issue, too, is that there was no denial of access to prison programs or services because of the diapers. So diapers didn't make hygiene or prison toilets more accessible for Mr. Adams. To the contrary, the reasonable accommodation panel gave him access to same as any other inmate. Access to prison hygiene services, showers, laundry, linens, and clothing. He had the same as any other inmate. And he had additional access whenever an episode of incontinence occurred. As for toileting, he had a commode chair to provide him meaningful access to prison toilets. And using a diaper would mean avoiding using toilets altogether. So what Adam asserted in his reply brief is he needed a hygienic way to go to the bathroom because of his disability of incontinence. And what that speaks to is a bodily function of going to the bathroom, not a prison program or service. His claim is one of inadequate treatment for disability, which is not cognizable under the ADA. Under Munoz and Sons. Doesn't the prison system provide, you know, diapers and whatnot for prisoners that are incontinent? Isn't that kind of a service? It can if there's a medical need or if it's necessary to access prison services and programs. But isn't the provision of diapers, isn't that a service to begin with? Well, to the extent that the provision of diapers is a service, it's not a service that all inmates use. It's a service that's given to incontinent prisoners to treat their incontinence. So again, we're back to that treatment for a disability. But I mean, you keep referencing that there was a determination of no medical necessity. Is there anything in this record to indicate that the prison thought he was lying about being incontinent? No, but what we do know is when he did get the diapers restored, what he had told, and this is at page 201 in the record, Adam says that he expressed concern about overnight protection due to severe spinal pain and difficulty. And that was what was causing him to urinate at night. And at that point, he told that to Dr. Loderzain. And when he disclosed that, she prescribed him diapers because she realized that he had and what was causing it and he had a need for it. And she also did the prostate examination. So, although in hindsight, this might not have happened as smoothly as it should have or could have, it just doesn't rise the level of deliberate indifference. And in order to get monetary damages under the ADA, Mr. Adam had to prove deliberate indifference. And here, what we see is we see each prison official he comes to taking some action, investigating. Some provided a modified accommodation. Some provided delegate, like actually, he wrote a letter to actually delegated to a sergeant to follow up. The doctors, Lad and Loderzain, both prescribed him medications. Loderzain gave him diapers. Everybody took some action. So, this isn't a case where prison officials, as this court noted earlier, just simply ignored the plaintiff. It's a case where they tried to investigate, determine the veracity and make sure there was a medical need there. Because we do have to... I want to jump in on one more point related to this medical necessity point. Is there anything in the record that indicates that during the time that is relevant to this lawsuit, there was an affirmative finding by some medical personnel in the prison that he did not need incontinent supplies? So, the best site I'm aware of is pages 245 and 234, which is a grievance response. And it refers to the discontinuation of the diaper accommodation. And what it says is it occurred because there was no corroborating data or diagnosis showing that it was medically necessary. Those responses done by medical staff or done by prison staff or security staff? It was a healthcare grievance. So, I can't tell you. I don't know particularly in this situation, but what I know generally happens is that it is assigned out to a medical personnel to investigate and then they come back and report. And then the grievance response is written based on that. But the response is basically, essentially, you would infer from it, somebody looked at medical records, didn't find any notation about needing incontinent supplies. Therefore, they're not medically necessary. And that's my understanding is that they, not saying that there was not previously provided, but that there was no justification showing, because the person has to apply their standards. That's different than what I was pointedly asking. What I was pointedly asking, is there anything in the medical record that affirmatively said, he doesn't need these, they aren't medically necessary? And you might think that that would be true because he made so many requests. Well, certainly, we also know that when he saw Dr. Ladd, Dr. Ladd looked through and also confirmed that there was nothing in the record showing they were medically indicated. So, Dr. Ladd's progress notes would also support that decision. And he looked at and evaluated and examined Mr. Adam and didn't find any medical necessity there as well. All right. Any other questions? All right. Thank you, counsel. We understand the argument. We've got a couple of minutes for rebuttal. Thank you, Your Honor. Thank you, Your Honors. Just to address that most recent point, that RAP, reasonable accommodation panel response was written by prison staff, but looking at medical records, saying there's no evidence in the medical records. The problem is, he was never seen and evaluated. I mean, among several problems. So, the answer to that is no, and it wasn't written. The answer is no to what question? Pardon me. The answer is no, there's no affirmative finding that he did not need the diapers. There's no evidence whatsoever that he was not urinating on himself. This is going to Judge Forrest's questions, which is, and again, I think a sort of mystery of this record is these repeated suggestions that there's no medical cause for him urinating on himself. A question is, as opposed to what? Because it's uncontested that he was, in fact, urinating on himself and really suffering as a result. So, we have a statement from the CEO of the prison saying, we looked at the medical records and there's nothing in there. But again, he hadn't been evaluated since that was in September, and he would not be evaluated until December for the first time when he was seen by Dr. Ladd. To answer another one of Judge Forrest's questions, to my friend on the other side. Yes, Dr. Ladd did something that nobody had done before, which is he gave him trial medication for incontinence, and that was a good thing to do. It had bad side effects, and he had to go off it. And Mr. Adam was not given diapers. He was not given follow-up. He was never seen by Dr. Adam, or pardon me, by Dr. Ladd again. And to Judge Forrest's question about, well, is that Dr. Ladd's fault or is that somebody else's within the prison? And the answer is, for Adam, is that it's impossible to know because of these information asymmetries. In the same way that his accommodations in the first place were taken away without any notice to him. So, what we have from Adam's perspective is, he sees a doctor. The doctor says, I'm not going to give you diapers even though you say you're urinating on yourself because some people are malingering. I'm not saying you're malingering, but some people are. So, we'll try something else. A week later, he sees an RN. The RN says, how's the drug going? Adam says, I'm having terrible side effects. And the RN takes him off it. And he never sees Dr. Ladd again. Now, perhaps that information was not supposed to flow to Dr. Ladd, but it's impossible for Adam to find out because the normal mechanisms of documentary discovery and depositions are unavailable to prosaic incarcerated plaintiffs. Well, I want to ask about that. So, he didn't have any counsel at any point in the district court proceeding. Is that correct? That is correct. There has been reference to discovery being done. Can you describe what discovery was done in this case? My understanding is that essentially, no discovery was done by Mr. Adam. Mr. Adam filed a motion attempting to have what he sought to be sort of a conference where he could figure out what information he was entitled to. And defendants filed a motion to quash and said that's not valid under the federal civil procedure. And the district court quashed it. So, from your understanding of the case file or whatever materials he has, he didn't get any documentary discovery? That's correct. It's pretty standard for incarcerated plaintiffs to not be allowed to obtain any documentary discovery because they have no place to secure it. And no depositions were taken? And no depositions were taken. His deposition wasn't taken? Nobody's deposition was taken? Mr. Adam's deposition was taken by defendants. He obviously was not able to depose anybody else. And we're a real... Did he ask for documents? Did he ask to depose somebody? I believe that asking to depose somebody I know would have been futile. I'm familiar. I represented these kinds of cases as a lawyer. But I'm nonetheless curious. Did he ask? I don't know that he asked. I don't know if he asked. Did he ask for the appointment of a lawyer in the district court? He did not ask for an appointment of a lawyer. I see I'm over time. Thank you very much. All right. We thank all counsel in this matter. Adam v. California Department of Corrections and Rehabilitation is submitted for decision.
judges: PAEZ, BEA, FORREST